[Cite as *In re A.K.*, 2026-Ohio-2460.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HIGHLAND COUNTY


| | | | |
|---|---|---|---|
| In re A.K. | : | Case No. | 26CA3 |
| | : | | |
| Adjudicated Dependent Child. | : | <u>DECISION AND</u> | |
| | : | <u>JUDGMENT ENTRY</u> | |

**RELEASED 6/25/2026**

_____

<u>APPEARANCES</u>:

Alana Van Gundy, Bellbrook, Ohio, for appellant mother.

J.K., Hillsboro, Ohio, pro se appellant father.

Anneka P. Collins, Highland County Prosecuting Attorney, and James Roeder, Highland County Assistant Prosecuting Attorney, Hillsboro, Ohio, for appellee.

_____

Hess, J.

{¶1} The mother and father of A.K. appeal a judgment of the Highland County Court of Common Pleas, Juvenile Division, terminating their parental rights and granting permanent custody of the child to the Highland County Department of Job & Family Services, Child Protective Services (the "Agency"). Father presents four assignments of error. In the first two, he asserts that the trial court erred in not granting a continuance so that he could: (a) present witnesses and (b) adequately prepare for cross-examination of the Agency's witnesses. In his third assignment of error, father asserts that the trial court misapplied the law in reaching its decision to terminate his parental rights. Finally, father asserts that the granting of permanent custody to the Agency was against the manifest weight of the evidence because the trial court acknowledged his sobriety, the case plan

was not tailored to consider his demonstrated sobriety, and the guardian ad litem's report was not reliable or neutral.

{¶2}   Mother presents two assignments of error. She asserts that the trial court erred when it granted the Agency permanent custody without allowing her more time to resolve the Agency's concerns. Second, she asserts that the trial court committed plain error when it relied upon the guardian ad litem's report where the guardian ad litem did not follow the requirements of Rule 48.

{¶3}   For the reasons which follow, we overrule the parents' assignments of error and affirm the trial court's judgment.

## I.  FACTS AND PROCEDURAL HISTORY

{¶4}   On November 15, 2024, the Agency filed a complaint asserting that A.K. was an abused, neglected, and/or dependent child. That same day, the trial court granted the Agency emergency custody and subsequently granted continued temporary custody. An adjudicatory and dispositional hearing was held on March 6, 2025.

{¶5}   At the March 6, 2025 hearing,[1] an Agency employee testified that on November 12, 2024, A.K. was born to mother and father. The employee testified that the parents had been involved with the Agency prior to A.K.'s birth. The juvenile court admitted into evidence a May 22, 2023 judgment entry terminating their parental rights to A.K.'s sibling, S.K. The entry states that S.K. was born on September 27, 2021, placed in the temporary custody of the Agency on October 8, 2021, and adjudicated dependent on November 18, 2021. The entry also states that when S.K. was born, she and mother both tested positive for marijuana, that father tested positive for amphetamine and

---

[1] The summary of the testimony and findings is taken from *In re A.K.*, 2025-Ohio-2935, ¶ 3–7 (4th Dist.).

methamphetamine on October 27, 2021, that the parents refused or avoided being drug tested during the pendency of the case, and that the parents had shown no interest in completing their case plan. Later during the hearing, the trial court stated that it had reviewed S.K.'s file and was taking judicial notice of the pleadings, allegations in the complaint which were admitted by the parents, and findings in S.K.'s case.

{¶6}     The employee testified that the Agency received a report that mother tested positive for methamphetamine and amphetamine when A.K. was born, that A.K. showed signs of withdrawal in the hospital, and that the parents were unwilling to cooperate with hospital staff and social workers. On November 14, 2024, the employee went to the hospital, and "[t]here were multiple security guards on the unit due to the unwillingness to cooperate." The parents refused to speak to the employee. Based on the employee's investigation, she determined the allegation of methamphetamine use to be true. She developed a case plan which required, among other things, that the parents complete a drug and alcohol assessment, follow treatment recommendations, and submit to random drug screens. The parents refused to sign the case plan and said they would not work the plan. Another Agency employee testified mother refused a request for a random drug screen, and under Agency policy, a refusal is considered a positive on all panels.

{¶7}     Dr. Jason Tatka, a pediatric hospitalist for Nationwide Children's Hospital who works in the Adena Regional Medical Center, testified that he treated A.K. and had reviewed her medical records. The records indicated that the day after A.K. was born, at 3:15 a.m., a nurse observed that A.K. had sweat beads on her forehead, tremors, and rapid respirations, which Dr. Tatka testified are "clinically suggestive of medication or drug withdrawal." Dr. Tatka testified that A.K.'s umbilical cord tissue tested positive for

methamphetamine and amphetamine. Dr. Tatka testified that this "would suggest given general biology that the baby had been exposed to methamphetamine or amphetamine for some time" "so that that tissue absorbed that chemical or that substance." This suggested in utero drug exposure, "which can only have come from the ingestion via the mother." In his medical opinion, in utero drug exposure creates a substantial risk to the child.

{¶8} Mother testified that she was positive for methamphetamine when A.K. was born but denied ever using methamphetamine. When asked to explain why she tested positive, mother testified, "I have documentations [sic] and pictures that I did not give a urine sample at that time that they said that at -- it was at 4:26 a.m., and I was on a stress test machine. And I have documentations [sic] and pictures of it. I did not give a sample." Mother also testified that "studies and stuff" said there were "like ten different medicines that can make you -- make a baby test positive" and that she was on one of them, ibuprofen. However, mother admitted that she is not a medical professional. Mother acknowledged that she refused to do a drug screen requested by an Agency employee and that she had not completed any case plan services but claimed she had only gotten the case plan "just the other day." Father also testified.

{¶9} On March 12, 2025, the trial court issued an entry of adjudication and disposition. The court found by clear and convincing evidence that A.K. was an abused, neglected, and dependent child. The court found A.K. was an abused child under R.C. 2151.031(C)[2] because the medical records and testimony of Dr. Tatka demonstrated she

---

[2] The court's entry states that A.K. is an abused child under R.C. 2151.031(B), but this is a typographical error which the court evidently carried over from the complaint, which also cited R.C. 2151.031(B). The language used in the complaint implicates R.C. 2151.031(C), which was R.C. 2151.031(B) until the statute was amended by 2023 Am. Sub. H.B. 33, effective October 3, 2023.

had methamphetamine and amphetamine in her umbilical cord tissue. The court found A.K. was a neglected child under R.C. 2151.03(A)(2) because Dr. Tatka testified that the results of the umbilical cord testing demonstrated prolonged methamphetamine and amphetamine use by mother, which were faults and habits of mother, that the prolonged drug use placed A.K. at substantial health risk, and that A.K. demonstrated clear signs of withdrawal. The court found that A.K. was a dependent child under R.C. 2151.04(C) because her condition was such as to warrant the State, in her best interest, in assuming guardianship. The court also found that A.K. was a dependent child under R.C. 2151.04(D). The court stated that "having taken Judicial Notice of the case of S.K. . . ., the circumstances surrounding S.K.'s removal and Permanent Custody are substantially the same as those surrounding A.K." The court found that reasonable efforts were made to prevent A.K.'s removal from her home and ordered, pursuant to R.C. 2151.353(A)(2)(a), that A.K. remain in the Agency's custody for one year, to automatically terminate on November 15, 2025, unless a timely motion was filed with the court. The parents appealed and we affirmed the trial court's judgment. *In re A.K.*, 2025-Ohio-4643 (4th Dist.); *In re A.K.,* 2025-Ohio-2935, ¶ 3-7 (4th Dist.), appeal not allowed sub nom. *In re A. K.*, 2025-Ohio-5429, reconsideration denied sub nom. *In re A.K.*, 2026-Ohio-475.

{¶10} During the fall of 2025, the parents filed 13 different pro se motions on various matters and the Agency filed a motion for permanent custody. The trial court held two pretrial conferences, one in October 2025 and one in December 2025, to review motions and to advise the parents of their rights to attorneys, both of whom elected to appear pro se throughout the proceedings. At the second December 1, 2025 pretrial, the court again reviewed various motions, the parents again were advised of their rights to

attorneys, the basic trial procedures were reviewed, and the parents were advised that they could give the trial court information for the issuance of subpoenas to witnesses. A final hearing was set for December 18, 2025 on the Agency's motion for permanent custody and to address all pending motions.

{¶11} Prior to the final hearing, the parents filed several more motions and the guardian ad litem filed a report with the trial court. The Agency filed its witness list approximately a week before the final hearing.

{¶12} At the final hearing, father stated that he believed he had requested the court subpoena a list of witnesses for the hearing, but none of the witnesses were in court. After a review of the father's witness list filing and a phone recording the father made of his conversation in the clerk's office when he filed his witness list, the trial court determined that father did not make a written or verbal request for the court to subpoena the witnesses. Instead, his filing was a witness list with a summary of expected testimony. The court granted a short recess to allow parents to telephone their witnesses to see if they could appear voluntarily. However, after the recess, the parents informed the court that the witnesses could not appear and/or could not be reached.  Father also requested a continuance because he had not received the Agency's witness list until that morning.

{¶13}  The trial court decided to move forward with the hearing to allow the Agency to present its witnesses and, following the Agency's witnesses, granted a continuance of the hearing until January 28, 2026 to allow the father to submit a list of witnesses to be subpoenaed for the second day of the hearing and present evidence.

{¶14} On the first day of the hearing, mother testified that the case plan included a drug and alcohol assessment, drug screenings, and parenting classes, and she never

completed any of the plan objectives. Mother testified that she participated in one drug screen in November 2024 in which she only tested positive for marijuana and at that point mother believed that her child should have been returned to her custody following that drug test. As a result, she did not believe she needed to comply any further with any aspect of the case plan. Mother testified that the caseworker visited her home but she refused to allow him to come inside. Mother testified that even though father has never visited A.K., mother was not concerned with his lack of visitation because she does not believe father should have to be "put through" supervised visitation because "he's innocent in all of this."

{¶15} Father testified that he was never personally given his own case plan, but reviewed mother's and believed his was similar. He testified that his case plan was mailed to him and acknowledged Agency workers offered him opportunities to review it. However, he testified that he did not sign it. Father testified that at the time of the hearing, he was unemployed; his last employment was July 2025.  Father testified that he was in school full time working toward a bachelor's degree, recently finished an associate's degree, and is looking for work. He completed a mental health assessment with a mental health and drug/alcohol specialist and filed a verification letter a week before the hearing. However, he did not sign a release for his treatment provider to communicate with the Agency. Father admitted that he has not taken any Agency-requested drug screens in this case and acknowledged that he has not provided the Agency documentation of a mental health assessment. He testified that he took a parenting class as part of a group through his doctor, partly online and partly in-person. He acknowledged he has never

visited A.K. during the entire pendency of the case and that he had another child placed in the Agency's permanent custody.

**{¶16}** The Agency caseworker Casey Cook testified that he has been assigned to the case since March 2025, taking over from another caseworker. A case plan was already in effect when he took over, and he mailed the plan to both parents and attempted to review it with them in person. He confirmed the plan elements described by mother were accurate and stated the plan was amended to add services for the father after the Agency received custody and later amended for permanent custody. Neither parent signed a case plan, and both repeatedly told him they would not work a case plan. Cook received no drug screens, mental health documentation, parenting class proof, or drug and alcohol assessment documentation from either parent. He testified that father informed him that he would email information about services, but father never sent it.

**{¶17}** Cook testified that the parents had a scheduled visit to see A.K. that was canceled for a claimed flat tire. However, Cook went to their home, observed functional tires, attempted to contact them, and was told to leave by father. Cook has never been allowed inside the home despite multiple attempts, including unannounced visits and efforts to meet monthly at the home and at Highland County's Family Advocacy Center (FAC) where supervised visits with A.K. were held. He communicated by text to schedule appointments, but the parents did not show, and they ignored him after an April 21, 2025 court hearing. He frequently contacted father at the FAC when father transported mother, during which father refused drug screens repeatedly in May, July, August, and September 2025, often asserting he was not required to test. Cook identified certified court records showing the parents previously had parental rights to another child, S.K., permanently

terminated. He stated both parents were invited to two semi-annual review meetings but did not attend.

**{¶18}** Cook testified that he has visited the foster home and A.K. is thriving. A.K. has remained in the same placement and in Agency temporary custody since removal. Cook supports the Agency's permanent custody request as in the child's best interest and believes reunification cannot be achieved within a reasonable time. On cross-examination by father, Cook denied writing that he "can't wait" to get permanent custody, though he acknowledged noting in activity logs that the case was heading toward permanent custody, which he characterized as appropriate transparency about the likely case direction given the parents' lack of cooperation. Cook confirmed he told mother that if she did not engage, the Agency would have to file for permanent custody, and she understood.

**{¶19}** Taylor Ball testified that she is a station monitor with FAC, which provides supervised visitation and a monthly co-parenting education class. Her duties include supervising visits, fielding calls, scheduling and conducting orientation, handling paperwork, and maintaining records. Ball testified that mother completed orientation, was scheduled for weekly visits, and had 52 total available visits since the case began. Of those 52, mother attended 22 visits, which generally went well. Mother's last visit occurred on November 4, 2025. Father completed orientation but has never visited the child.

**{¶20}** V.B. testified that she is A.K.'s foster parent and would be interested in adopting A.K. if the Agency is granted permanent custody. V.B. currently has A.K.'s sibling, S.K., in her care. V.B. testified that A.K. is doing well and is very bonded with her sibling.

{¶21}   Dennis Kirk testified he is a certified guardian ad litem since about 2001. He is the guardian ad litem for A.K. and served in the same role for A.K.'s sibling, S.K. Since A.K.'s birth, he has had no formal contact with the parents other than seeing them in court. He stated neither parent called nor appeared at his office during this case. He sent the parents a contact letter on October 24, 2025, received no response, and the letter was not returned. He prepared and filed a guardian ad litem report on December 9, 2025, recommending permanent custody to the Agency and he maintains that opinion. During father's cross-examination, the father asserted he had called his office, and Kirk explained he never received a call, that calls are handled by his secretary, and he had no awareness of any call in this case. The trial court confirmed the parents had previously visited Kirk's office in the sibling's case and knew its location.

{¶22} Following the presentation of the Agency's witnesses, the trial court continued the hearing until January 28, 2026 to give the parents an opportunity to subpoena and present witnesses.

{¶23}   On the second day of the hearing in January, Megan Lookado testified she is a registered nurse in the special care nursery at Adena Regional Medical Center. She cared for A.K. the morning after birth for approximately six to seven hours in the special care nursery. She recognized the mother but had not met the father. She explained the special care nursery supports infants needing extra help, and nurses assess and alert physicians who decide admissions. She assessed A.K. for neonatal withdrawal signs and observed increased respirations in the 80s to 90s per minute, tremors, sweating, and myoclonic jerks, which can be withdrawal indicators. Lookado testified that infants are assessed every three hours and admitted to the nursery if symptoms are high, and A.K.

was placed due to increased respirations and poor feeding.  She defined myoclonic jerks and confirmed they can indicate withdrawal, but her purpose for A.K.'s nursery stay was to monitor respiratory status, which stabilized, and A.K. returned to the room around 1:00 p.m. the day after delivery. Lookado did not recall telling the mother she disagreed with the doctor's assessment or that she saw no withdrawal symptoms.

{¶24}  Shelly Raybourne testified she knew mother from working together where Raybourne was a manager. She described mother as loving, caring, trustworthy, reliable, and someone who completed tasks without oversight. Raybourne testified that she had never known mother to abuse illegal substances or to parent unsafely and observed no behavior suggesting drug use during the 2024 pregnancy. She learned the Agency became involved right after the baby's birth and testified that the mother told her the hospital "came in and took her baby." The mother told her confirmatory drug testing from the hospital was negative and that mother's statements remained consistent. On cross, Raybourne testified that the mother did not tell her that the baby or the mother had tested positive for methamphetamine. Raybourne testified that she had not spent a great deal of time with the parents, had never interacted with the father, and had never been inside their home.

{¶25}  April Throckmorton testified she knew both parents from work and primarily worked with the mother. She saw mother at work three to four days per week and said her position required reliability and trust, which mother met without supervision. Throckmorton never observed careless or reckless behavior from mother. She described mother's frequent, positive interactions with children at the on-site ice cream shop and with the owner's grandson and said mother was excellent with children. She confirmed

that this trust and interaction were ongoing and stated she would trust mother to care for a young child. On cross-examination, Throckmorton testified that she had seen father help mother at work, knew the child was removed but could not recall the stated reason, and was not told that the baby or mother had tested positive for methamphetamine. She was aware a prior child was taken, which she believed was for a positive test for marijuana. She has not worked with mother since late May or early June 2025, has only visited her a few times at her new workplace, did not spend a lot of time with her, and had not been inside her home.

{¶26} Natasha Gray testified she knew mother from visiting her former workplace, where Gray's mother and aunt continued to work after mother replaced Gray. She described mother as responsible, employed, and maintaining housing. She had no personal concerns about mother's parenting but had not seen her with children. She observed no behavior suggesting drug use and said mother had not told her she used illegal substances. Gray knew mother had a child and that the Agency took the child but was not told a reason. She had never seen mother parent her own children, knew mother had two children who were with the Agency, did not spend a lot of time with mother, and had not interacted with father.

{¶27} The trial court issued a judgment entry permanently terminating parental rights and granting the Agency permanent custody of A.K. The trial court addressed all pending motions and then addressed the permanent custody issue. The trial court found that the child cannot be placed with the parents within a reasonable time or should not be placed with the parents, citing R.C. 2151.414(B)(1)(a) and (E). The court found clear and convincing evidence that, "notwithstanding reasonable case planning and diligent efforts

by the Agency to assist the parents to remedy the problems that initially caused A.K. to be placed outside the home, both parents have failed continuously and repeatedly to substantially remedy the conditions causing A.K. to be placed outside of her home." R.C. 2151.414(E)(1). A.K. was found to have methamphetamine and amphetamine in her umbilical cord tissue, which demonstrated prolonged use by mother. Both parents were aware of the case plan and "mother testified she would not work a case plan and the father testified he refused to go over his case plan." Additionally, the court found that both parents repeatedly refused to be drug screened, would not meet with the Agency, and "have elected to thumb their nose at the Agency and elected not to work their case plan."

**{¶28}** The court found that mother visited only 22 of the 52 possible visits with A.K. and did not provide a credible reason for failing to visit 30 times and found that father had abandoned his daughter, having never visited her. "Clearly both parents have demonstrated a lack of commitment toward A.K. by failing to regularly visit with her." R.C. 2151.414(E)(4) and (10).

**{¶29}** The court found that the parents had their rights involuntarily terminated with respect to a sibling, S.K., and "have failed to provide clear and convincing to prove that, notwithstanding the prior termination in [that case], they can provide a legally secure permanent placement and adequate care for the health, welfare[,] and safety of A.K." R.C. 2151.414(E)(11).

**{¶30}** The court found that placement of A.K. with either parent would be a threat to her safety because of the prolonged substance abuse indicated by the presence of drugs in A.K.'s umbilical cord and the parents' refusal to work the case plan. R.C. 2151.414(E)(15).

**{¶31}** Reviewing the factors in R.C. 2151.414(D), the court determined that it would be in A.K.'s best interest to permanently terminate all parental rights. It found the child had no interaction with her father and though mother's interactions when she visited went well, mother only visited 22 of 52 possible times.  A.K. is thriving in foster care, where her other sibling, S.K., is also placed. R.C. 2151.414(D)(1)(a). The child was 14 months old and therefore unable to express her wishes, but the guardian ad litem recommended permanent custody with the Agency. R.C. 2151.414(D)(1)(b). A.K. has been in temporary custody of the Agency continuously for 15 months. R.C. 2151.414(D)(1)(c). Father has abandoned the child, and both parents have had their parental rights terminated with respect to a sibling. R.C. 2151.414(D)(1)(e). The court also determined that allowing additional time for reunification efforts in the case would be an improper experimentation with the future of the child and would prevent permanency and stability for the child. And, although the court noted a reasonable efforts finding is not required at this stage, it found that the Agency made all reasonable efforts to prevent removal of A.K. from the parents' home.

**{¶32}**  Both parents appealed. (OR 151)

## II.  ASSIGNMENTS OF ERROR

**{¶33}**  Father presents the following assignments of error:

1.  The trial court violated Appellant's due process rights under the Fourteenth Amendment and Article I, Section 16 of the Ohio Constitution by denying a meaningful opportunity to present witnesses and evidence.

2.  The trial court abused its discretion by proceeding with a permanent custody hearing despite undisputed discovery deficiencies and lack of timely disclosure of the State's witness list.

3. The trial court misapplied R.C. 2151.414 by improperly foreclosing relevant evidence through an overly rigid prohibition on reexamination of adjudicatory findings.

4. The trial court's decision granting permanent custody was against the manifest weight of the evidence and not supported by clear and convincing evidence.

**{¶34}** Mother presents the following assignments of error:

1. The trial court erred in granting permanent custody to Highland County Children's Services because additional time and resources could have allowed Mother to address the Agency's concerns.

2. The GAL did not abide by the requirements of Rule 48 and therefore did not provide an informed recommendation to the Court. Reliance on the GAL's testimony or report would constitute plain error.

### III.  LAW AND ANALYSIS

**{¶35}** We will address father's first and second assignments of error together because they both raise the father's contention that the hearing should have been continued either so that he could prepare cross-examination of the Agency's witnesses or so that he could subpoena his own witnesses.

### A.  Request for Continuance

**{¶36}** Father contends that the trial court abused its discretion when it denied his request for a continuance of the permanent custody hearing. Father requested a continuance because he had not understood the proper procedure for requesting subpoenas of witnesses and because he did not receive a copy of the Agency's witness list until the day of the hearing.

**{¶37}** A trial court has broad discretion to determine whether to grant a continuance. *State v. Conway*, 2006-Ohio-791, ¶ 147, citing *State v. Unger*, 67 Ohio St.2d 65 (1981), syllabus. We reverse a trial court's decision denying a continuance only if the

trial court abused its discretion. *State v. Jones*, 91 Ohio St.3d 335, 342 (2001). An abuse

of discretion is an "unreasonable, arbitrary, or unconscionable use of discretion, or * * * a

view or action that no conscientious judge could honestly have taken." *State v. Brady,*

2008-Ohio-4493, ¶ 23.

{¶38} An appellate court employs a balancing approach to determine whether the

trial court abused its discretion when it denied a continuance. *In re Ca.S.*, 2021-Ohio-

3874, ¶ 33 (4th Dist.). In exercising discretion, a trial court should weigh any prejudice

suffered by the party seeking the continuance against the court's right to control its docket

and provide prompt, efficient justice to the public. *Id*.

> A court should also consider: (1) the length of the delay requested; (2)
> whether other continuances have been requested and received; (3) the
> inconvenience to litigants, witnesses, opposing counsel and the court; (4)
> whether the requested delay is for legitimate reasons or whether it is
> dilatory, purposeful, or contrived; (5) whether the defendant contributed to
> the circumstance which gives rise to the request for a continuance; and (6)
> other relevant factors, depending on the unique circumstances of the case.

(Citation omitted.) *Id.* The balancing test is applied on a case-by-case basis and the

appellant must show how the denial of the continuance resulted in prejudice. *Id*. at ¶ 34.

Juv.R. 23 allows for continuances, "only when imperative to secure fair treatment for the

parties." *Matter of D.H.*, 2023-Ohio-2368, ¶ 9-13 (4th Dist.).

{¶39} First, the trial court continued the December 18, 2025 hearing in progress

to allow father to request subpoenas of his witnesses and present his evidence. Thus,

father's first assignment of error is meritless – he was granted a continuance to subpoena

witnesses and present evidence.

{¶40} Second, we find that the trial court's decision to deny father's motion for a

continuance of the Agency's case-in-chief so father could better prepare for cross-

examination was not unreasonable, arbitrary, or unconscionable. None of the Agency's witnesses were unexpected. Father and mother were two of the witnesses and the remaining Agency witnesses were readily anticipated because they were the case worker, the FAC visitation supervisor, the foster parent, and the guardian ad litem. Moreover, father had been through a previous permanent custody hearing with A.K.'s sibling and could have reasonably anticipated the Agency's witnesses.

**{¶41}** A continuance would have inconvenienced the court, the Agency, and its witnesses as they were present in the courtroom and prepared to proceed that day. Additionally, although father claims this was "trial by ambush," he has failed to explain how any of the witnesses were unexpected or how he was prejudiced. *State v. Broom*, 40 Ohio St.3d 277, 288 (1988) ("the defendant must show how he was prejudiced by the denial of the continuance before there can be a finding of prejudicial error"). We find that the trial court did not abuse its discretion when it denied father's motion for a continuance. We overrule father's first and second assignments of error.

### B.  The Bar Against Relitigating the Adjudication Findings

**{¶42}** In his third assignment of error, father argues that the trial court improperly barred the relitigation of the adjudication findings. However, this argument is entirely without merit because the adjudication findings cannot be relitigated at the permanent custody hearing. R.C. 2151.414(A)(1), governing permanent custody hearings, provides in relevant part, "The adjudication that the child is an abused, neglected, or dependent child and any dispositional order that has been issued in the case . . . pursuant to the adjudication *shall not be readjudicated at the hearing* and shall not be affected by a denial of the motion for permanent custody." (Emphasis added.) The trial court properly limited

the scope of the permanent custody hearing.[3] We overrule father's third assignment of error.

### C. Guardian Ad Litem Report & Permanent Custody Award

**{¶43}** Father contends that the trial court's decision to grant the Agency permanent custody was against the manifest weight of the evidence. Father contends that the trial court found that he did not have substance abuse issues. Father also contends that the case plan was not reasonably calculated to lead to reunification because it did not take into account his "demonstrated sobriety." Last, father contends that the trial court erred in relying upon the guardian ad litem's report, which violated Sup.R. 48 (outlining the duties of a guardian ad litem).

**{¶44}** Mother's two assignments of error also contend that the trial court erred in granting the Agency permanent custody and the trial court erred in relying on the guardian ad litem's report because it violated Sup.R. 48. She contends that the trial court erred in granting the Agency permanent custody without giving her more time to work on her case plan.

**{¶45}** Because both parents challenge the trial court's grant of permanent custody to the Agency and its reliance on the guardian ad litem's report, we will address these assignments of error together.

### 1. Guardian Ad Litem Report

---

[3] We note that a nurse who attended to the child at birth was permitted to testify to address the parents' Civ.R. 60(B) motion, which was one of the many motions they had filed prior to the permanent custody hearing. She refuted the parents' contention that the medical evidence proved A.K. was not experiencing withdrawal symptoms.

**{¶46}** Father contends that the guardian ad litem report was "written for the Agency, not [as an] independent investigator." Father argues that the trial court relied upon the report "without addressing its lack of independence in violation of Sup.R. 48."

**{¶47}** Mother contends that the guardian ad litem did not "abide by the requirements of Rule 48" and therefore the trial court should not have relied upon his testimony or report. Mother contends that the guardian ad litem violated Rule 48 when he did not visit her or observe her in her home or during her visits with A.K.

a.  Standard of Review

**{¶48}**  Appellate courts will not reverse trial court decisions to admit a guardian ad litem's testimony and recommendation unless the court abused its discretion. *In re K.W.*, 2018-Ohio-1933, ¶ 97 (4th Dist.), citing *Corey v. Corey*, 2014-Ohio-3258, ¶ 9 (2d Dist.) (stating that "whether to consider the report of a GAL when the GAL did not fully comply with Sup.R. 48(D) is within a trial court's discretion"). A trial court does not abuse its discretion unless it acts in an unreasonable, arbitrary, or unconscionable manner. *In re K.W.* at ¶ 97.

b. Legal Analysis

**{¶49}**  The purpose of a guardian ad litem "is to protect the interest of the child and 'assist a court in its determination of a child's best interest.' " *In re C.B.,* 2011-Ohio-2899, ¶ 14, quoting Sup.R. 48(B)(1) and citing R.C. 2151.281(B). "[T]he guardian's role is to 'perform whatever functions are necessary to protect the best interest of the child, including, but not limited to * * * monitoring the services provided the child by the public children services agency * * * [and filing] any motions and other court papers that are in the best interest of the child.' " *Id.*, quoting R.C. 2151.281(I).

b. Legal Analysis

**{¶50}** The Rules of Superintendence provide that a guardian ad litem's function in a juvenile proceeding is "to provide the court with relevant information and an informed recommendation regarding the child's best interest." Sup.R. 48(D). A guardian ad litem's general duties include investigating the background of the parents and delivering a report and recommendation to the court regarding the child's best interests. *In re C.D.M.*, 2013-Ohio-3792, ¶ 25 (4th Dist.).

> The "Rules of Superintendence are designed (1) to expedite the disposition of both criminal and civil cases in the trial courts of this state, while at the same time safeguarding the inalienable rights of litigants to the just processing of their causes; and (2) to serve that public interest which mandates the prompt disposition of all cases before the courts." Courts have interpreted the Rules of Superintendence as general guidelines for the conduct of the courts that do not create substantive rights. "They are not the equivalent of rules of procedure and have no force equivalent to a statute. They are purely internal housekeeping rules which are of concern to the judges of the several courts but create no rights in individual defendants."

(Citations omitted.) *In re E.W.*, 2011-Ohio-2123, ¶ 12 (4th Dist.).

**{¶51}** Because Sup.R. 48(D) provides general guidelines, not substantive rights, we have concluded that a guardian ad litem's failure to comply with Sup.R. 48(D) does not constitute grounds for reversal. *In re B.S.,* 2024-Ohio-5183, ¶ 82 (4th Dist.); *In re K.W.* at ¶ 100; *In re C.T.L.A.*, 2014-Ohio-1550 (4th Dist.); *In re R.S.*, 2012-Ohio-2016 (4th Dist,).

**{¶52}** Here the trial court did not abuse its discretion by considering the guardian ad litem's testimony and recommendation. First, neither mother nor father objected to the admission of the guardian ad litem's report or of the testimony. At the hearing, father did not object to the report's admission but rather argued that the trial court should give it little to no weight because the report lacked neutrality.

Court: . . . I was going to ask you about Mr. Kirk's Guardian Ad Litem Report. Any objection to that document being admitted as an exhibit and considered by the Court? Father?

Father: Not - - not necessarily an objection, other than it, you know, it read - - to me more as a - - as a report as if he was narrating, like the appeals or the agent - - pretty much for the Agency, not independent investigator. So, other than that, I would just say minimal weight if possible.

Court: So, and I'm not trying to put words in your mouth, but it's okay for the Court to consider it as an exhibit here, but you're arguing I shouldn't give it much consideration in the Permanent Custody Motion for the reasons you stated. Is that correct?

Father: That is correct. You've got it, Your Honor.

**{¶53}** The failure to object at the trial court level to an error results in a waiver of that error on appeal. *In re E.W.*, 2011-Ohio-2123, ¶ 11 (4th Dist.). Thus, we recognize an error only if it constitutes plain error.

[A]n appellate court may recognize an error that an appellant waived only if it constitutes plain error. Courts should exercise extreme caution when invoking the plain error doctrine, especially in civil cases. Courts should therefore limit applying the doctrine to cases "involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process * * *."

(Citations omitted.) *Id.; In re B.S.,* 2024-Ohio-5183, ¶ 73-82 (4th Dist.) (when mother failed to raise an objection in the trial court, she waived argument that guardian ad litem failed to comply with Sup.R. 48 by failing to contact her, observe her with the children, and visit her home).

**{¶54}** This case is not one of those exceptional cases in which the alleged error seriously affects fairness. Moreover, the trial court, as the factfinder, is permitted to assign weight to the guardian ad litem's testimony and recommendation and could choose to believe or disbelieve it. *In re K.W.*, 2018-Ohio-1933, ¶ 102 (4th Dist.), citing *In re M.Z.*,

2012-Ohio-3194, ¶ 35 (9th Dist.)  (stating that trial court permitted to "believe or disbelieve the guardian's testimony and to consider it in the context of all the evidence before the court").

**{¶55}** Here, we find nothing about the trial court's decision to consider the guardian ad litem's testimony and recommendation that seriously affects the basic fairness, integrity, or public reputation of the judicial process. Although the mother argues the guardian ad litem did not interview her or observe her home or her visitations, the record shows that the guardian ad litem made attempts to contact the parents, but they did not cooperate or respond to his communications. The record established that both parents refused to participate in the case plan, undergo drug screenings, or to allow persons associated with the case to enter their home or interview them. Given both parents' consistently uncooperative stance, neither can now be heard to complain that the guardian ad litem did not do enough to reach out to them.

**{¶56}**  We overrule mother's first assignment of error.

### 2. Permanent Custody Award

**{¶57}** Both parents contend that the trial court erred in granting permanent custody to the Agency. The mother contends she should have been given more time to work on the case plan and the father contends the evidence supports a finding that he did not have a substance abuse issue. Based on the assignments of error and the arguments set forth in the parents' briefs, it appears that they are challenging the trial court's finding under R.C. 2151.414(B)(1)(a) that the child "cannot be placed with the parents within a reasonable time or should not be placed with the parents."  Neither parent has challenged the trial court's best-interest-of-the-child determination under R.C.

2151.414(B)(2). Therefore, we focus our analysis on the trial court's findings under R.C.

2151.414(B)(1)(a) and the factors under subpart (E).

### a. Standard of Review

**{¶58}** The Supreme Court of Ohio has stated:

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.] "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). " 'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' " *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

(Brackets sic.) *In re Z.C.*, 2023-Ohio-4703, ¶ 14.

### b. Statutory Framework

**{¶59}** Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody to a public children services agency if the court determines by clear and convincing evidence that (1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (e) apply, and (2) it is in the best interest of the child. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or

conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶60}** The Agency sought permanent custody as in the best interest of the child and because, under R.C. 2151.414(B)(1)(a), "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." The trial court went through the factors under R.C. 2151.414(E) in determining that the child cannot be placed with the parents within a reasonable time or should not be placed with the parents. It found R.C. 2151.414(E)(1), (4), (10), (11), and (15) applicable.

**{¶61}** R.C. 2151.414(E) states in relevant part:

(E) In determining . . . whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, . . . that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
. . .

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
. . .

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child . . . and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

. . .

(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

### i. Failure to Substantially Remedy Conditions

**{¶62}** There is clear and convincing evidence to support the trial court's findings that, notwithstanding reasonable case planning and diligent efforts by the Agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, both parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. The child was removed because medical test results showed that A.K. had methamphetamine and amphetamine in her umbilical cord tissue, which demonstrated prolonged methamphetamine and amphetamine use by mother. The parents failed to remedy this condition because, by their own testimony, they failed to undergo drug assessment, counseling, and testing.

**{¶63}** Father argues that the trial court found, "[Father], you don't seem to have used during this case." However, the trial court explained that it was impossible to know about father's sobriety because father refused all drug testing during the pendency of the case.

Court: - -  would you agree that the evidence as I remember it and understand, is you've not been drug tested by the agency during the life of this case? I think your position is, I've done nothing wrong so I'm not going to be tested. I think that's what the evidence shows.

So, one conclusion of that, of your decision is to believe what you're saying. There's no need to be tested because I'm not on drugs. Another conclusion is, if you have nothing to hide, why act like that? That's kind of the other side of the argument which is, I think what [the Agency] is making.

So it is true, I think, that the Agency has presented no evidence that you've – during the life of this case since A.K. was born that you've used drugs, but the reasons for that is you wouldn't be tested. So therefore, there is no evidence and you've brought in no independent proof for the Court to consider of that fact here recently that I'm aware of. . . . So I don't disagree with your statement. There's no evidence here that you've  -- are still using drugs. But I stated the reasons why there is no evidence, and - - and that definitely is a concern.

{¶64} Father also contends that the case plan did not consider his "demonstrated sobriety." However, father failed to demonstrate sobriety by undergoing any of the drug screenings as required in the case plan. Had father tested for drugs as required, the recommendations for drug treatment and counseling would have been adjusted according to the test results. However, father refused to demonstrate his alleged sobriety by refusing all drug screens.

{¶65}   Mother argues that there "was no evidence that Mother had a continued substance abuse issue as she did test negative on one drug screen required by the Agency."  She contends that there was no evidence that her home was unsuitable or at any visit she was under the influence of substances. She argues that the statute allows for up to 2 years from the time of the Agency's initial filing for the trial court to make a permanent custody finding and here she was given only 11 months.

{¶66} However, mother refused entry into her home, admitted that she refused to take multiple drug tests, and testified that she knew that if she refused to undergo drug testing, the Agency would consider it positive on all panels. Mother admitted she

submitted to one drug screen in November 2024, which was positive for THC. But because it was not positive for fentanyl or amphetamines, she believed that A.K. should have been returned to her custody. She testified that she refused to comply with the plan or to cooperate with the Agency employees. Although she argues that there was no evidence she was under the influence of drugs during her visitations with A.K., she missed over half of the scheduled visits, attending only 22 of the 52 scheduled visits and refused to submit to random drug screenings.

{¶67} The mother also argues that she should have been given two years to try to address the Agency's concerns. However, as the Agency correctly asserts, R.C. 2151.414(B)(1)(a) allows the Agency to file for permanent custody before the child has been in custody for 12 months. Here, where both parents adamantly refused to work with the Agency and repeatedly refused drug screens, there is no reason to believe that additional time would have resulted in reunification.

{¶68} We find that clear and convincing evidence supports the trial court's finding that the parents failed to substantially remedy the conditions causing the child to be placed outside the home under R.C. 2151.414(E)(1).

ii. Demonstrated Lack of Commitment to Child

{¶69} The trial court found that the father never visited A.K. and the mother "elected to visit only 22 out of a possible 52 available visits at the FAC. The mother provided no credible reason for her failure to visit A.K. 30 times." Based on this uncontroverted evidence, the court found that this demonstrated a lack of commitment to the child under R.C. 2151.414(E)(4). Neither parent appears to challenge this finding and we find that the record supports it.

### iii. Abandonment

**{¶70}** The trial court found that father abandoned A.K. by failing to visit her at all. Father does not challenge this finding. We find clear and convincing evidence supports the trial court's finding the father abandoned A.K. under R.C. 2151.414(E)(10) because the father testified that he never visited A.K.

### iv. Parental Rights of a Sibling

**{¶71}** The trial court found that the parental rights were involuntarily terminated with respect to A.K.'s sibling and that neither parent provided clear and convincing evidence that, notwithstanding that prior termination, they could provide a legally secure permanent placement and adequate care for A.K. under R.C. 2151.414(E)(11). We find that the evidence clearly and convincingly supports this finding because, as we discussed above, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. Both parents testified that they are not working on the plan and have refused drug screening throughout the case.

### v. Threat to Child's Safety

**{¶72}** Last, the trial court found that the A.K. was found to be an abused child due to the drugs in her system at birth and that the seriousness, nature, and likelihood of recurrence of that abuse makes placement of A.K. with the parents a threat to A.K.'s safety because, after November 2024, both parents refused to be drug screened. The court found "the parents have refused to work their case plan" which "makes A.K.'s placement with either parent a threat to the safety of A.K." under R.C. 2151.414(E)(15).

**{¶73}** Based on the foregoing, we conclude the trial court's finding that A.K. cannot be placed with the parents within a reasonable time or should not be placed with the parents is not against the manifest weight of the evidence. The Agency presented competent and credible evidence upon which the court reasonably could have formed a firm belief that parental rights should be terminated and a grant of permanent custody to the Agency was in the best interest of the child. Accordingly, we conclude that the permanent custody award is not against the manifest weight of the evidence and overrule father's fourth assignment of error and mother's second assignment of error.

IV. CONCLUSION

**{¶74}** Having overruled the assignments of error, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellants shall split the costs equally.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Highland County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY:  _____
        Michael D. Hess, Judge




**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**